IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

BRIAN H.,[1]

           Plaintiff,

v.

COMMISSIONER SOCIAL SECURITY
ADMINISTRATION,

           Defendant.

Case No. 6:19-cv-00336-YY

OPINION AND ORDER

YOU, Magistrate Judge:

Plaintiff Brian H. seeks judicial review of the final decision by the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433. This court has jurisdiction to review the Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(g)(3). For the reasons set forth below, the Commissioner's decision is AFFIRMED.

---

[1] In the interest of privacy, the court uses only plaintiff's first name and the initial of his surname and does the same for other individuals whose identification could affect plaintiff's privacy.

1 – OPINION AND ORDER

## PROCEDURAL HISTORY

Plaintiff filed an application for DIB on July 29, 2015, alleging a disability onset date of February 27, 2015. Tr. 15, 76, 90. His date last insured was December 31, 2015. *Id.* The Commissioner denied plaintiff's application for benefits initially and on reconsideration. *Id.* Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on December 6, 2017. Tr. 33-63. After receiving testimony from plaintiff and a vocational expert, ALJ MaryKay Rauenzahn issued a decision on March 23, 2018, finding plaintiff not disabled within the meaning of the Act. Tr. 15-26. The Appeals Council denied plaintiff's request for review on January 22, 2019, making the ALJ's decision the final decision by the Commissioner, subject to review by this court. Tr. 1–3; 42 U.S.C. § 405(g); 20 C.F.R. § 422.210.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). This court must weigh the evidence that supports and detracts from the ALJ's conclusion and "'may not affirm simply by isolating a specific quantum of supporting evidence.'" *Garrison v. Colvin*, 759 F.3d 995, 1009-10 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). This court may not substitute its judgment for that of the Commissioner when the evidence can reasonably support either affirming or reversing the decision. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Instead, where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted); see also *Lingenfelter*, 504 F.3d at 1035.

**SEQUENTIAL ANALYSIS**

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920; *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006) (discussing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)).

At step one, the ALJ found plaintiff met the insured status requirements of the Act through December 31, 2020. Tr. 18. At step two, the ALJ determined plaintiff suffered from the following severe impairments: lumbar degenerative disc disease; major depressive disorder; post-traumatic stress disorder ("PTSD"); anxiety disorder with agoraphobia; and avoidant personality disorder. *Id.*

At step three, the ALJ found plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Tr. 20. The ALJ next assessed plaintiff's residual functional capacity ("RFC") and determined he could perform a full range of medium work, but with the following limitations: he could have no exposure to moving mechanical parts and unprotected heights, as defined by the Dictionary of Occupational Titles ("DOT"); he could understand, remember, and carry out uncomplicated and routine instructions that could be learned in thirty days or less; he was limited to low-stress work, defined as work requiring few changes in the work setting, only occasional changes in work duties, occasional simple work-related decision-making, and no conveyor-belt paced work; he was restricted to isolated work involving no public contact; he could have occasionally direct coworker

interactions with no group tasks (although no limitation on incidental coworker contact), and occasional contact with supervisors. Tr. 21.

At step four, the ALJ found plaintiff was unable to perform his past relevant work. Tr. 25.

At step five, the ALJ found that considering plaintiff's age, education, work experience, and RFC, he could perform jobs that existed in significant numbers in the national economy, including "janitor" and "stores laborer." Tr. 25-26. Thus, the ALJ concluded plaintiff was not disabled at any time from the alleged onset date through March 23, 2018, the date of the ALJ's decision. *Id.*

## DISCUSSION

### I.    Background

At the December 6, 2017 hearing, plaintiff testified that he lived at home with his wife and their dog. Tr. 36. He explained that for 15 years, he had worked as the vice president of his family's business, which manufactures machine tools. Tr. 37, 53-54, 56.

Plaintiff possesses an Oregon driver's license but prefers to get rides from others because he gets lost easily. Tr. 36-37. Plaintiff recounted an incident where he became lost driving home from a nearby town when he did not use a map or GPS system. Tr. 46. He conceded he was able to drive to medical appointments and other familiar locations. *Id.*

Plaintiff testified that he would have difficulty even working a simple job, such as putting lightbulbs in a box, because he cannot focus for extended periods. Tr. 40. Plaintiff previously repaired and maintained vehicles as a hobby, but no longer has the mental capacity to do this due to memory limitations. Tr. 40, 44.

In addition to mental issues, plaintiff described having leg pain, which one of his doctors attributed to a back condition. Plaintiff also described numbness in his hand due to carpel tunnel "problems." Tr. 42. Plaintiff testified that he was able to perform yard work, such as raking, mowing, and chopping wood. Tr. 43. Additionally, plaintiff has severe cluster headaches, for which he felt oxygen treatment in conjunction with pain medication was helpful. Tr. 51. Plaintiff stated his headaches appear without a clear trigger and recur every few months. Tr. 52.

## II.     Medical Opinion Evidence

Plaintiff contends that the ALJ erred in assessing the medical opinions of two treating providers, Dr. Ayala and Dr. Belozer.

### A.     Relevant Law

The ALJ is responsible for resolving conflicts in the medical record, including conflicting opinions. *Carmickle v. Commissioner*, 533 F.3d 1155, 1164 (9th Cir. 2008). The law distinguishes between the opinions of three types of sources: treating sources, examining sources, and non-examining sources. *See* 20 C.F.R. § 404.1527.[2] The opinions of treating sources are generally accorded greater weight than the opinions of non-treating sources. 20 C.F.R. § 404.1527(c)(2); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A treating source's opinion that is not contradicted by the opinion of another source can be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991). If, however, a treating source's opinion is contradicted by the opinion of another source, the ALJ must provide "specific, legitimate reasons" for discrediting the treating source's opinion. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983). Specific, legitimate reasons for rejecting a medical

---

[2] The Commissioner has issued revised regulations changing this standard for claims filed after March 27, 2017. *See* 20 C.F.R. § 404.1520c. Plaintiff's claim was filed before March 27, 2017, and is therefore controlled by 20 C.F.R. § 404.1527.

opinion may include its reliance on a claimant's discredited subjective complaints, inconsistency with the medical records, inconsistency with a claimant's testimony, or inconsistency with a claimant's activities of daily living. *Tommasetti*, 533 F.3d at 1040.

### B.     Dr. Ayala

Plaintiff's treating mental health provider, Thomas Ayala, Ph.D., LPC, provided his opinions in detailed psychosocial reviews in 2016 and 2017.

#### 1.     2016 Psychosocial Review

In the 2016 review, Dr. Ayala included the following diagnoses: PTSD, cognitive disorder, and anxiety disorder with agoraphobia. Tr. 372. Dr. Ayala noted that plaintiff had a "significant history of trauma, which can result in a complex and debilitating state of disorganized thinking, chronic exhaustion, anger, and avoidance." Tr. 373. The doctor further opined that plaintiff "can be marginally at risk in chaotic environments due to trauma-specific cues that create a psychological and physical state of being 'hypervigilant.'" *Id.* Dr. Ayala assessed "a pervasive pattern of instability of interpersonal relationships, self-image, affect, and marked impulsivity," and noted that plaintiff's "psychological health has been functionally compromised in the last five years." *Id.* Plaintiff's mental status examination "reveal[ed] he has maladaptive relational schema." Tr. 374. "There are times when his attention is not able to be sustained" and "[t]here is evidence of some distractibility and his ability to not track conversation well." *Id.*

Dr. Ayala noticed "a slight abnormality of gate, posture, or deportment possibly due to chronic pain or back issues." *Id.* His physical pains "contribute to identity conflicts that significantly compromise his quality of life." Tr. 374-75.

In summary, Dr. Ayala opined that plaintiff's cognitive deficits were becoming increasingly debilitating and were further exacerbated by "dysfunctional and dangerous" family members, harmful friendships, and increasing distrust of others. Tr. 374. Dr. Ayala concluded that plaintiff demonstrates "disorganized thinking," and that his inability to focus "may be the result of a wide range of stressors that can occur as a result of frequent emotionally and psychologically traumatic experiences." Tr. 375. Further, plaintiff's "strategy and way of thinking . . . compromises core beliefs and basic assumptions about how his world operates [and] skews his perception and understanding of himself and others." *Id.*

### 2.     2017 Psychosocial Review

Dr. Ayala's 2017 psychosocial review opinion was substantially similar to the 2016 review. There were some differences, however. For example, Dr. Ayala noted that one of plaintiff's providers felt there was an undiagnosed condition on the Asperger syndrome spectrum and set forth several factors that appeared consistent with plaintiff's presentation. Tr. 378-79. Dr. Ayala noted that plaintiff had a history of trauma linked to his demotion in the family business and eventual firing by his younger brother. Tr. 379-80. More diagnoses were included in the second assessment: PTSD, major depressive disorder, anxiety disorder with agoraphobia, cluster headaches, nightmares, and avoidant personality disorder. Tr. 380.

Dr. Ayala reiterated that plaintiff has a history of psychological trauma "which results in complex and debilitating states of disorganized thinking, chronic exhaustion, anger, and avoidance." *Id.* The doctor reported that within the past five years, plaintiff had a history of "clearly defined and specifically planned" suicidal ideation. Tr. 381. The doctor opined that plaintiff's mental health was "functionally compromised in the last three years with an exacerbation of cognitive deficits." *Id.* Plaintiff's "pronounced cognitive deficits" include

concrete thinking and impaired abstract thinking; lack of insight into the consequences of behavior; short and long-term memory deficits; difficulty following complex and sequential directions; loss of orientation to person, place, and time; distractibility and shortened attention span; impulsive behavior; and speech and language impairment. *Id.* Dr. Ayala reported "an increase in cognitive deficits" suggestive of mild cognitive impairment. *Id.*

In summary, Dr. Ayala concluded that plaintiff's constellation of mental and emotional deficits were "contributing to an identity that significantly compromises his quality of life and makes employability unrealistic." Tr. 382. The result, opined the doctor, was "embedded maladaptive psychological schema," and plaintiff's personality traits reflected "introversion, avoidance, and isolation." *Id.* The remainder of the summary was consistent with the conclusions of the 2016 psychosocial review. Tr. 383.

### 3. Analysis

Plaintiff argues that the ALJ failed to provide legally sufficient reasons to reject Dr. Ayala's opinion testimony. Defendant maintains that the ALJ did not err, but properly accounted for Dr. Ayala's assessments in the RFC.

The ALJ reviewed and summarized the findings of Dr. Ayala in her decision. Tr. 23-24. The ALJ recognized Dr. Ayala's observations that plaintiff's "psychological trauma result[ed] in debilitating states of disorganized thinking, chronic exhaustion, anger, and avoidance," that "one of the most significant characteristics of the claimant's mental health is his cognitive deficits, coupled with an inability to focus and concentrate," and that "claimant is isolated and withdrawn." Tr. 23. Further, the ALJ recognized Dr. Ayala's opinion that plaintiff "has limitations in social interaction and concentration." *Id.*

The ALJ, however, noted that while Dr. Ayala claimed he had treated plaintiff about 23 times since October 2013, the record reflected that plaintiff did not see Dr. Ayala between "2016, shortly after claimant stopped working, and September 2017, when [plaintiff's] representative sent [him] to see Dr. Ayala." Tr. 23-24. The ALJ also noted that a mental status exam score generated by Dr. Ayala was inconsistent with other contemporaneous scores, and that the doctor did not "assess specific function-by-function limitations in vocationally relevant terms." Tr. 24. Accordingly, the ALJ determined that Dr. Ayala's opinions were "of limited probative value in assessing claimants functioning, overall," and accorded the doctor's opinions "partial weight." Tr. 23-24.

Plaintiff asserts "there can be no serious dispute that the opinions, findings, and observations of Dr. Ayala . . . establish that Plaintiff is unable to meet the basic mental demands of competitive employment due to his documented neuropsychological problems." Pl.'s Br. 12, ECF #15. Plaintiff argues that his ability to carry out and remember simple instructions, generally recognized as the base requisite for any successful employment, "is plainly eroded by his disorganized and/or confused thought processes, inability to focus and concentrate, impaired memory, and increasingly debilitating cognitive deficits," and "support his inability to succeed in a workplace." *Id.*

In Social Security disability law, however, ALJs are precluded from assigning special significance to statements by medical providers that touch on the ultimate issue of a claimant's disability under the Act. *See* 20 C.F.R. §§ 404.1527(d)(3); *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011) (treating physician's opinion that a claimant is disabled or unable to work is not binding on the ALJ). In other words, whether a claimant retains the ability to work is plainly an administrative decision reserved to the Commissioner, not a medical determination. *Id.* The

ALJ therefore did not err by failing to credit Dr. Ayala's opinion that plaintiff's employment was unrealistic.

Further, although plaintiff argues that his disorganized thinking and other impairments erode his ability to perform even simple work, Dr. Ayala did not express that opinion in his narrative assessments. Moreover, the ALJ recognized the limitations that plaintiff highlights, and accommodated for them in the RFC by limiting him to "uncomplicated and routine instructions and tasks that can be learned in thirty days or less," low-stress work with few changes in the workplace routine, only occasional simple decision-making, and no conveyor-belt paced work. Tr. 21.

Plaintiff's assignments of error with regard to his social limitations in the workplace fail for similar reasons. Again, Dr. Ayala's opinion that plaintiff's "persistent inability to engage socially has become disabling" is a statement that contemplates the ultimate issue of disability under the Act. To the extent plaintiff contends that the RFC did not accurately encapsulate the extent and severity of his social limitations, plaintiff has failed to identify any specific social limitations that were excluded from the RFC. *See* Pl.'s Br. 12-13. Indeed, the ALJ recognized plaintiff's substantial limitations in the area of social interaction due to his impairments, and included restrictions limiting plaintiff to isolated work, no public interaction, occasionally direct co-worker interactions with no group tasks, and only occasional supervisory contact. Tr. 21.

**C.    Dr. Belozer**

In a single chart note dated September 26, 2017, treating physician Marylou Belozer, M.D., indicated that, "due to neuropsych issues[,] [it] would be very challenging for this patient to hold a full time job or part time." Tr. 401. Plaintiff argues that the ALJ erred by failing to comment at all on the doctor's notation, and alternatively, that the ALJ failed to provide a legally

sufficient rationale for rejecting the notation to the extent it was an otherwise valid treating medical opinion.  Plaintiff asserts the regulations are clear that, if a treating source's opinion is given controlling weight, an ALJ's decision must contain specific reasons for according it less weight.  Pl.'s Br. 13 (citing Social Security Ruling ("SSR") 96-2p, *available at* 1996 WL 374188).

Defendant argues that an ALJ is not required to discuss "every piece of evidence," but must merely explain why "significant probative evidence has been rejected."  Def.'s Br. 4 (quoting *Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984)).  But here, the ALJ did not mention Dr. Belozer's ALJ assessment at all.  The ALJ's omission was erroneous.  *See Garrison*, 759 F.3d at 1013 (holding ALJ errs by ignoring a medical opinion).

Despite the ALJ's error, however, plaintiff has failed to demonstrate any harm.  In the Ninth Circuit, a reviewing court may not find an ALJ's error harmless "unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination."  *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006).  Even fully crediting Dr. Belozer's opinion that it would be "challenging" for plaintiff to maintain full- or part-time employment, it is not clear that the ultimate non-disability decision is altered.  Indeed, it appears the RFC formulation is consistent with Dr. Belozer's opinion even though the ALJ failed to mention it.  In short, the ALJ assessed a detailed, significantly limiting RFC, consistent with Dr. Belozer's opinion that employment would be challenging for plaintiff.  Further, plaintiff does not identify any functional limitations that Dr. Belozer assessed but the ALJ failed to include in the RFC.

11 – OPINION AND ORDER

## CONCLUSION

The Commissioner's decision is AFFIRMED for the reasons stated herein.

IT IS SO ORDERED.

DATED May 26, 2020.

                                                /s/ Youlee Yim You
                                                Youlee Yim You
                                                United States Magistrate Judge